# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

| | |
|---|---|
| WESTERN REFINING YORKTOWN, INC. f/k/a GIANT YORKTOWN, INC., <br>                     Plaintiff, <br> vs. <br><br> BP CORPORATION NORTH AMERICA, INC. and BP PRODUCTS NORTH AMERICA, INC., <br>                     Defendants. | Civil Action 4:08cv118 |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 12(b)(3) MOTION TO DISMISS OR TRANSFER VENUE AND RULE 12(b)(6) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

### Preliminary Statement

Plaintiff Western Refining Yorktown, Inc. f/k/a Giant Yorktown, Inc. ("Plaintiff") brought this action for breach of contract, specific performance and declaratory relief because Defendants BP Corporation North America, Inc. and BP Products North America, Inc. (collectively "Defendants") failed to honor the indemnity provisions of a February 8, 2002 Asset Purchase Agreement (the "Agreement") for the purchase and sale of the Yorktown Refinery located in Yorktown, Virginia ("Yorktown Refinery"). Although Plaintiff's claims have been properly brought in this District, Defendants have moved under Federal Rule of Civil Procedure 12(b)(3) to Dismiss or Transfer Venue. Defendants have also moved under Federal Rule of Civil Procedure 12(b)(6) to Dismiss for Failure to State a Claim. Defendants' arguments concerning the appropriate venue for this action and the propriety of Plaintiff's claims have no merit, and must be denied.

Defendants have not met their heavy burden to establish that Plaintiff's choice of forum, which is appropriately afforded "substantial weight," should be disturbed. *Gen. Foam Plastics*

*Corp. v. Kraemer Exp. Corp.*, 806 F. Supp. 88, 89-90 (E.D. Va. 1992); *Schleit v. Warren*, 693 F.

Supp. 416, 423 (E.D. Va. 1988). Venue is proper in the Newport News Division of the Eastern

District of Virginia under the Federal and Local Rules and the Agreement. The Agreement

expressly permits the filing of an action for specific performance "in any court of the United

States." Agreement, Doc. No. 11-3 § 19.[1] Defendants attempt to avoid litigating this matter in

this jurisdiction by wrongly alleging that Section 21 of the Agreement mandates exclusive venue

in Illinois. Contrary to Defendants' argument, Section 21 of the Agreement specifically states

that venue in Illinois courts is "non-exclusive." *Id.* § 21. Properly construed, it is clear that

Section 21 of the Agreement, which is the sole basis for Defendants' venue challenge, functions

to expand proper venue to *include* the state and federal courts in Cook County, Illinois, as

opposed to *limiting* venue to those courts. Such a provision in the Agreement was necessary to

allow Defendants to bring suit in Chicago, Illinois, where Defendants have their headquarters.

*See id.* § 20 (listing Defendants' addresses). Section 21 cannot be construed or understood as a

"clear and specific" selection by the parties of an exclusive venue in Illinois. *Whirlpool Corp. v.*

*Certain Underwriters at Lloyd's London*, 662 N.E.2d 467, 471 (Ill. Ct. App. 1996). Because

Defendants' argument that the Agreement mandates venue in Illinois is contrary to the plain

meaning of its applicable terms, and Defendants have provided no justification for transferring

venue out of this District, Defendants' motion must be denied.

Defendants have likewise failed to demonstrate that Plaintiff is not the proper party to

enforce the terms of the Agreement. The assignment of rights under the Agreement from Giant

---

[1] Documents previously filed with the Court will be referenced by their Docket Number ("Doc. No. __"). Documents filed as exhibits to Plaintiff's Response will be referenced as Plaintiff's Exhibit ("PL Ex. __"). Plaintiff references the copy of the Agreement filed by Defendants as Document 11-3 (Exhibit 1 to Defendants' motion) herein, and also has attached a copy of the Agreement to the Declaration of Kim Bullerdick, PL Ex. 1, Attach. 1, for completeness of the record.

Industries, Inc. to Giant Yorktown, Inc. was made with the full knowledge and consent of

Defendants and was included by the parties in the closing documents on May 14, 2002. *See* PL

Ex. 1 ¶ 4. Indeed, Defendants have admitted that the assignment properly conveyed indemnity

rights under the Agreement to Giant Yorktown, Inc. Defendants' Brief, Doc. No. 11, at 21

(quoting Complaint, Doc. No. 1 ¶ 28). On September 19, 2007, Giant Yorktown, Inc. simply

changed its name to Western Refining Yorktown, Inc., as is evident from the readily available

public records of the State of Delaware, where Plaintiff is incorporated. *See* PL Ex. 2, Attach. A.

This name change is properly reflected in the caption of the Complaint. Doc. No. 1 ¶ 10. As

such, Defendants' arguments concerning the Agreement's non-assignment clause have no merit.

*Harris Bank Argo v. Midpack Corp.*, 502 N.E.2d 1127, 1129 (Ill. Ct. App. 1986) ("Defendants

cannot deny liability because [Plaintiff] changed its name. There is no reason to prove an

assignment.").

Finally, Defendants' Motion to Dismiss must fail because Plaintiff complied with all of

the requirements set forth in the Agreement for timely asserting a claim for indemnification.

Section 15(i) of the Agreement requires a claim to be brought within two years of the closing

date and further specifies what it means to bring a claim under the Agreement:

> A claim shall be deemed to have been brought *only upon delivery of a proper
> Indemnification Notice to the other party* at the address set forth in Section 20.

Agreement, Doc. No. 11-3 § 15(i) (emphasis added). The term "Indemnification Notice" is a

defined term of the Agreement. Section 15(e) requires:

> written notice to the party from whom indemnification is sought (the
> "Indemnifying Party"), setting forth the specific facts and circumstances, in
> reasonable detail, relating to such Loss or Losses and the amount of Loss or
> Losses (*or a reasonable, good-faith estimate thereof if the actual amount is not
> known or not capable of reasonable calculation*) ("Indemnification Notice").

Agreement, Doc. No. 11-3 § 15(e) (emphasis added) (underlining in original). Plaintiff complied

with these requirements in bringing its claim for indemnification.  In fact, Defendants attached

Plaintiff's November 18, 2003 Indemnification Notice as Exhibit 2 to their brief.  Doc. No. 11-4;

PL Ex. 1, Attach. D.  Because Section 15(e) specifies that the Indemnification Notice may

contain either the amount sought or "a reasonable, good-faith estimate thereof if the actual

amount is not known or not capable of reasonable calculation," Defendants' argument that

Plaintiff was required to incur $5,000,000 in costs before bringing a claim for indemnification is

wrong and must be rejected.

For these reasons and the others more fully discussed below, Defendants' Rule 12(b)(3)

Motion to Dismiss or Transfer Venue and Rule 12(b)(6) Motion to Dismiss must be denied.

## Standards For Review

Federal Rule of Civil Procedure 12(b)(3) is the "correct procedural vehicle for bringing a

motion to dismiss based on improper venue under a forum selection clause."  *Hipage Co. v.*

*Access2Go, Inc.*, --- F. Supp. 2d ---, 2008 WL 4960451, at *6 (E.D. Va. Nov. 20, 2008). In

deciding such a motion without an evidentiary hearing, "the trial court must draw all reasonable

inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-

moving party." *Id.* (internal quotation omitted).

Similarly, in considering a Rule 12(b)(6) motion for failure to state a claim, the Court

must construe the Complaint in the light most favorable to Plaintiff, read the Complaint as a

whole, and take the facts asserted therein as true. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130,

1134 (4th Cir.1993).  A Rule 12(b)(6) motion to dismiss should be denied where the "[f]actual

allegations [are] enough to raise a right to relief above the speculative level on the assumption

that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127

S.Ct. 1955, 1964-65 (2007)).  In this case, the parties agree that Illinois law provides the

substantive standards for construing the Agreement because the "Agreement and the obligations of the parties hereunder shall be governed by and construed and enforced in accordance with the substantive and procedural laws of the State of Illinois." Agreement, Doc. No. 11-3 § 21.

### Statement Of Facts

As Defendants admit, it was generally known for more than a decade before the Agreement was reached that there was environmental contamination at the Yorktown Refinery. Defendant's Brief, Doc. No. 11 at 2. This environmental contamination was due to Defendants' violation of Health, Safety and Environmental Laws during their 46 years of operation of the Yorktown Refinery. Complaint, Doc. No. 1, ¶ 19. To address the environmental contamination, the United States Environmental Protection Agency ("USEPA") issued an Administrative Order on Consent to Defendants in 1991, which required them to perform a number of investigative and cleanup activities under the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq. Id.* ¶¶ 20, 21.

From January 1992 to November 2000, Defendants submitted at least seven investigative reports which concluded that "'there are contaminants of concern, present in the soil, sediments, and groundwater' at the Yorktown Refinery, including benzene, toluene, xylene, polycyclic aromatic hydrocarbons, phenols and heavy metals such as arsenic, chromium and cadmium." Complaint, Doc. No. 1, ¶ 24. Defendants continued their efforts to address the environmental contamination caused by their operation of the Yorktown Refinery until the sale of the Yorktown Refinery in 2002. *Id.* ¶ 25. Plaintiff has been conducting the investigation and cleanup of Defendants' contamination since it assumed ownership of the Yorktown Refinery on May 14, 2002, and has spent more than $17,000,000 to clean up the contamination caused by Defendants' violation of Health, Safety and Environmental laws. *Id.* ¶¶ 28, 29, 36. Plaintiff anticipates that

the total costs to clean up the contamination caused by Defendants' operation of the Yorktown Refinery will be $46,200,000. *Id.* ¶ 37.

As Defendants have admitted, the parties' knowledge "that there was pre-existing environmental contamination at the Refinery site and that EPA had ordered the contamination to be cleaned up was, in large part, the source of extensive provisions in the Agreement related to the parties' apportionment of environmental liability." Defendants' Brief, Doc. No. 11, at 2. Accordingly, the Agreement set procedures for Plaintiff to seek Indemnification from Defendants for "property damage caused by, or any environmental remediation due to a violation of the Health, Safety and Environmental Laws during the pre-Closing operation of the business by Seller or other members of the BP Group ('Remediation Losses')," in addition to other types of potential anticipated losses. Agreement, Doc. No.11-3 § 15(b)(iv) (underlining in original). The Agreement also capped Defendants' maximum exposure for Indemnification at $35,000,000, *id.* § 15(k), and provided a formula for allocating the environmental clean-up costs between the parties, *id.* § 15(*l*).

On November 18, 2003, Plaintiff brought a claim for Indemnification under the Agreement by following the "Procedures Relating to Indemnification Among Buyer and Seller" in Section 15(e) of the Agreement. Complaint, Doc. No. 1, ¶ 46; Agreement, Doc. No. 11-3 § 15(e); Doc. No. 11-4 (Defendants' Exhibit 2). Since 2003, Plaintiff has made a number of additional requests for Defendants to reimburse Plaintiff for Remediation Losses under the Indemnification provisions of the Agreement. Complaint, Doc. No. 1, ¶ 48. Because Defendants have failed to indemnify or reimburse Plaintiff as required by the Agreement, Plaintiff brought this action for breach of contract, specific performance and declaratory judgment.

## Argument

I.    **Defendants' Venue Motion Should Be Denied.**

Defendants' motion to dismiss or transfer for improper venue should be denied because

venue is proper in the Newport News Division of the Eastern District of Virginia under the

Federal and Local Rules and the Agreement. The Agreement expressly permits the filing of an

action for specific performance "in any court of the United States." Agreement, Doc. No. 11-3

§ 19. Defendants' attempts to construe the Agreement to require venue in Illinois are contrary to

the plain meaning of its applicable terms.

In evaluating Defendants' motion to dismiss for improper venue, "the trial court must

draw all reasonable inferences in favor of the non-moving party and resolve all factual conflicts

in favor of the non-moving party." *Hipage*, 2008 WL 4960451, at *6 (internal quotations and

citations omitted). In addition, in evaluating a motion to transfer pursuant to 28 U.S.C.

§ 1404(a), "[t]he burden is on the moving party to show that transfer to another forum is proper."

*Gen. Foam*, 806 F. Supp. at 89. To satisfy this burden, Defendants must show "that the balance

of convenience among the parties and witnesses is *strongly* in favor of the forum to which

transfer is sought." *Id.* at 89-90 (emphasis in original) (internal quotation omitted). Moreover, "a

plaintiff's choice of forum ordinarily is accorded substantial weight, particularly when, as here,

the plaintiff brings an action in its home forum and the cause of action has a significant

connection to that forum." *Id.* (internal citations omitted).

In sum, Defendants' "burden is a heavy one, for unless the balance is strongly in favor of

the defendant, the plaintiff's choice of forum should rarely be disturbed." *Schleit*, 693 F. Supp.

at 423 (quoting *Hodson v. A.H. Robins Co.*, 528 F. Supp. 809, 817 (E.D. Va. 1981), *aff'd* 715

F.2d 142 (4th Cir. 1983)). Defendants have failed to meet their heavy burden of showing that the

balance of convenience of the parties strongly weighs in favor of transferring this case.

**A.    Venue Is Proper in the Eastern District of Virginia.**

Plaintiff has met its burden of showing that venue is proper in the Eastern District of

Virginia. *Wood v. Barnette, Inc.*, 648 F. Supp. 936, 938 (E.D. Va. 1986).  Venue is proper in this

Division of this District because the Yorktown Refinery, which is the subject of the action is

situated in the Newport News Division of the Eastern District of Virginia, 28 U.S.C.

§ 1391(a)(2); Complaint, Doc. No. 1, ¶ 6, a substantial part of the events or omissions giving rise

to the claim – specifically the environmental remediation undertaken by Plaintiff and

Defendants' failure to indemnify Plaintiff for it – occurred in this Division of this District, 28

U.S.C. § 1391(a)(2); Complaint, Doc. No. 1, ¶ 6, and Defendants reside in this Division of this

District, 28 U.S.C. §§ 1391(a)(2) & (c); Complaint Doc. No. 1 ¶ 7.  *See also* Local Rule 3(C).

**B.    The Agreement Does Not Require Venue in Illinois.**

Defendants attempt to avoid jurisdiction in this District by alleging that the Agreement

calls for exclusive venue in Illinois.  Defendants' Brief, Doc. No. 11, at 7.  However, the section

of the Agreement on which they rely specifically states that venue in Illinois is "non-exclusive."

Agreement, Doc. No. 11-3 § 21.  Section 19 of the Agreement further provides that jurisdiction

is proper in this Court (or any other where venue may be established under the Federal Rules), in

addition to the courts in Cook County, Illinois. *Id.* § 19.  For these reasons, Defendants' motion

must be denied.

In Section 19 of the Agreement, Defendants expressly agreed that Plaintiff "shall be

entitled" to bring an action for specific performance in the event of a breach of the Agreement.

Plaintiff has done so in this action.  In Section 19, Defendants also expressly agreed that Plaintiff

could bring an action for specific performance in any court having jurisdiction over the parties

and the matter.  Section 19 provides that:

> Each party hereto acknowledges and agrees that each other party would be
> damaged irreparably in the event of any of the provisions of this Agreement are
> not performed in accordance with their specific terms or otherwise breached.
> Accordingly, each party hereto agrees that each other party shall be entitled to an
> injunction or injunctions to prevent breaches of the provision of this Agreement
> and to enforce specifically this Agreement and the terms and provisions hereof in
> any action instituted *in any court of the United States or any state thereof having
> jurisdiction over the parties hereto and the matter* (subject to the provisions set
> forth in Section 21 below), in addition to any other remedy to which they may be
> entitled, at law or in equity.

Agreement, Doc. No. 11-3 § 19 (emphasis added). Thus, the Agreement does not limit the

proper venue for specific enforcement of the Agreement, but rather provides that venue is proper

in *any court* having personal and subject matter jurisdiction. *First Bank & Trust Co. of Ill. v.

Orland Hills*, 787 N.E.2d 300, 305 (Ill. Ct. App. 2003) (stating that "[w]hen parties agree to and

insert provisions into their agreement, we presume that this is done purposefully and that the

language employed is to be given effect. A court will not interpret an agreement in a way that

would nullify its provisions or render them meaningless.") (internal quotations omitted).

Because Defendants breached their duty to indemnify Plaintiff as required by the Agreement,

Complaint, Doc. No. 1 ¶¶ 58-64; Agreement, Doc. No. 11-3 § 19, and because the parties

acknowledged that any breach would entitle the other party to specific performance, Complaint,

Doc. No. 1 ¶¶ 66-68, Agreement, Doc. No. 11-3 § 19, Plaintiff is entitled to seek specific

performance "in any court of the United States or any state" that otherwise has jurisdiction over

the parties and matter. That includes this Court.

Defendants have not disputed, and cannot dispute, that this Court has personal

jurisdiction over the parties and subject matter jurisdiction over this matter. Defendants owned

the Yorktown Refinery for 46 years, Defendants are responsible for the environmental

contamination that is the subject of this action, and all of the requirements for diversity

jurisdiction have been met. Complaint, Doc. No. 1, ¶¶ 1, 5-9; *see Corry v. CFM Majestic Inc.*,

16 F. Supp. 2d 660, 663 (E.D. Va. 1998) (a party is subject to personal jurisdiction when its contacts with the forum are "continuous and systematic"); 28 U.S.C. § 1332(a).

Section 21 of the Agreement, on which Defendants rely, disavows any intention of the parties to alter the normal venue rules, which allow for proper venue in the Eastern District of Virginia. In the first sentence of Section 21 the choice of law provision is plainly mandatory, providing that interpretation of the Agreement ". . . shall be governed by . . . laws of the State of Illinois." In contrast, the venue provisions that follow in Section 21, which are relied upon by Defendants, are permissively phrased:

> Any action to enforce the terms hereof *may be properly venued in*, and shall be brought in, the federal or state courts located in Cook County in the State of Illinois *on a non-exclusive basis*.

Agreement, Doc. No. 11-3 § 21 (emphasis added). The phrase on which Defendants concentrate — "shall be brought in" — must be read in the context of the words that surround it. *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007) (noting that "words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others."). The complete phrase, which modifies "shall be brought in" with the permissive phrase "on a non-exclusive basis," clearly provides for optional rather than mandatory venue in that jurisdiction.

The plain meaning of Section 21 is to provide for optional proper venue in the courts of Cook County, Illinois, in addition to the other courts where proper venue can be established. Such a provision in the Agreement was necessary to allow Defendants the option to bring suit in Chicago, Illinois, where Defendants have their headquarters. *See* Agreement, Doc. No. 11-3 § 20 (listing Defendants' addresses). Without a provision allowing for the option of venue in Cook County, Illinois, Defendants could not bring claims to enforce the Agreement in that forum

because the obligations of the parties under the Agreement have no connection to that forum and Plaintiff would not be amenable to personal jurisdiction in that forum.  The only purpose for this provision is to provide for venue in a court where venue would otherwise be improper.  Indeed, Section 21 is titled "Submission to Jurisdiction," further confirming that this provision was simply intended to waive any objection to venue in Cook County, Illinois if Defendants chose to bring an action to enforce the Agreement in that jurisdiction.[2]

Defendants' argument that Section 21 requires exclusive jurisdiction in the courts of Cook County, Illinois would render much of the language in Sections 19 and 21 meaningless surplusage, in violation of a basic tenet of contract interpretation.  It is well settled, as Defendants recognize, that "[i]t is the duty of a court, when construing written contracts, to determine and give effect to the intention of the contracting parties." *Thomas Hoist Co. v. William J. Newman Co.*, 6 N.E.2d 171, 174 (Ill. 1937).  To properly do this, "effect must be given to each clause and word used, without rejecting any words as meaningless or as surplusage." *Id.*; *see also* Defendants' Brief, Doc. No. 11, at 9.  Defendants' interpretation of Section 21 as mandating venue in Illinois state or federal court to the exclusion of all other jurisdictions cannot be correct because it would effectively read the words "may be properly venued in" and "on a non-exclusive basis" out of Section 21.  In addition, Defendants' interpretation of Section 21 would render Section 19 meaningless because it would force the Court to read the phrase "any court of the United States or any State thereof" to mean exclusively "Illinois." *See Village of Creve Coeur v. Fletcher*, 543 N.E.2d 323, 324 (Ill. Ct. App. 1989) (holding that "it is fundamental that the court adopt a construction of the contract

---

[2] While the Agreement states that section headings are "for reference purposes only, and shall not in any way affect the meaning or interpretation of this Agreement," Agreement, Doc. No. 11-3 § 28, Illinois courts can and do consider the non-operational portions of contracts as an indicator of the parties' intent. *See First Bank & Trust*, 787 N.E.2d at 311.

that is reasonable rather than that which would produce an irrational or absurd result").

In recognition that their interpretation would render these portions of Section 21 superfluous, Defendants suggest that the Court should interpret the clause "on a non-exclusive basis" to mean that a case could be brought in either the state court in Cook County, Illinois or in the federal court in Cook County, Illinois, but in no other venue regardless of the normal venue rules. Defendants' Brief, Doc. No. 11, at 10. However, this interpretation renders the clause "on a non-exclusive basis" meaningless. Section 21 already provides that an action may be brought in "the federal <u>or</u> state courts" in Cook County, Illinois. Doc. No. 11-3 § 21 (emphasis added). There would be no need to use the phrase "on a non-exclusive" basis to simply reiterate what was already plainly stated. Defendants also fail to explain any possible meaning that "may be venued in" would have under their interpretation of Section 21. Instead, Defendants simply omit these words when they quote Section 21 in their Brief. Defendants' Brief, Doc. No. 11, at 7. Defendants' arguments fail to account for the fact that the clause on which they rely is both preceded and followed by clearly permissive, not mandatory, language. To give effect to all of Section 21, the proper interpretation is that it provides for permissive rather than mandatory venue in the courts of Cook County, Illinois.

Moreover, even if the Court finds that the language in Section 21 is not entirely clear, it must deny Defendants' motion to dismiss or transfer. As the Illinois courts expressly recognize:

> If parties to a contract agree to try their case in a specific forum they could be giving up important rights. At the same time, a forum selection clause seeks to bind a state to try a case it otherwise might not want. Good policy dictates that a true forum selection clause should be clear and specific.

*Whirlpool Corp.*, 662 N.E.2d at 471. Thus, if the Court finds that Section 21 of the Agreement is not "clear and specific," it should not construe it as a mandatory exclusive forum selection clause.

Finally, *Hipage Co. v. Access2Go*, on which Defendants' rely, further highlights the specificity required by this Court for the enforcement of forum selection clauses. 2008 WL 4960451 (E.D. Va. Nov. 20, 2008). In that case, this Court interpreted an exclusive forum selection clause that included strong mandatory language limiting the venue to the Central District of Illinois. *Id.* at *2. Most significantly, the forum selection clause stated that the selected courts "*shall have exclusive jurisdiction* of all matters arising out of or in connection with this Service Agreement." *Id.* (emphasis added). Such unambiguous mandatory language is not present in the Agreement in this case. To the contrary, the "Submission to Jurisdiction" provision of Section 21 of the Agreement contains permissive language that any action to enforce the terms of the Agreement "may properly be venued in, and shall be brought in, the federal or state courts located in Cook County in the State of Illinois on a non-exclusive basis." Agreement, Doc. No. 11-3, § 21. The "may be properly venued in" and "on a non-exclusive basis" language is the opposite of the "shall have exclusive jurisdiction" language that was central to the decision in *Hipage*. 2008 WL 4960451, at *2. In addition, the clear language of Section 19 providing that an action for specific performance may be brought in any court having jurisdiction over the parties and the matter further distinguishes the case at bar from the *Hipage* decision. By articulating a standard for specificity in forum selection clauses that is clearly not met in the present case, the *Hipage* decision confirms that venue is appropriate in this District.

### C.   There Are No Convenience Reasons to Transfer This Case to the Northern District of Illinois.

Defendants make no argument that the balance of convenience favors transferring this case, nor could they. Defendants cannot satisfy their heavy burden that the "balance of convenience among the parties and witnesses is *strongly* in favor of the forum to which transfer is sought," so their motion to transfer to the Northern District of Illinois should be denied. *Gen.*

*Foam*, 806 F. Supp. at 89-90 (emphasis in original).  In determining whether to transfer a case to another venue, "the court must consider the following factors related to convenience and justice: (1) the plaintiff's choice of venue; (2) the convenience of the parties and witnesses; and (3) the interest of justice." *Lycos, Inc. v. TiVo, Inc.*, 499 F. Supp. 2d 685, 691 (E.D. Va. 2007).  These factors support this Court retaining jurisdiction.

Plaintiff's choice of filing this case in the Eastern District of Virginia, where the Yorktown Refinery is located, should be afforded substantial weight.  "It is well settled that a court should rarely disturb a plaintiff's choice of forum unless the balance of hardships clearly favor transfer in favor of the defendant." *Verizon Online Servs., Inc. v. Ralsky*, 203 F. Supp. 2d 601, 624 (E.D. Va. 2002) (internal citations omitted).  Indeed, a "plaintiff's choice of forum is entitled to substantial weight, unless the plaintiff chooses a foreign forum and the cause of action bears little relation to the chosen forum." *Id.* at 623-24; *see also Lycos, Inc.*, 499 F. Supp. 2d at 692.  The Eastern District of Virginia is Plaintiff's home forum because, "[f]or purposes of venue . . . a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction," 28 U.S.C. § 1391(c), and Plaintiff's ownership and operation of the Yorktown Refinery would clearly subject Plaintiff to personal jurisdiction in the forum, *see Corry*, 16 F. Supp. 2d at 663 (noting that a defendant is subject to personal jurisdiction in a forum when its contacts with that forum are "continuous and systematic").  Thus, for venue purposes, this District is Plaintiff's "home forum."

In *Eastern Scientific Marketing, Inc. v. Tekna-Seal, Inc.* for example, the Eastern District of Virginia accorded the plaintiff's choice of forum substantial weight and refused to transfer venue where "in large part, the claim and many of the matters in controversy arose" in this District.  696 F. Supp. 173, 179 (E.D. Va. 1988).  Here, the action is based on environmental

cleanup at the Yorktown Refinery in this District and the actions and omissions giving rise to the controversy arose in this District. Complaint, Doc. No. 1, ¶¶ 1, 6. Moreover, the subject of this action is Defendants' failure to indemnify Plaintiff for the ongoing remediation of environmental contamination caused during Defendants' ownership and operation of the Yorktown Refinery, which is located in this Division of this District.

The convenience of the parties and witnesses also supports this Court's retention of jurisdiction over this matter. Defendants have made no showing, and cannot show, that the convenience of the parties or witnesses weighs in favor of transferring this case to the Northern District of Illinois. The personnel responsible for operating and maintaining the Yorktown Refinery are located in this District, as are the persons managing the remediation activities. In addition, this case will involve issues of whether Defendants violated Environmental, Health and Safety Laws, as that term is defined in the Agreement. *See* Complaint, Doc. No. 1, ¶ 1. Determination of this issue may require testimony from current or former employees of Plaintiff and Defendants who worked at the Yorktown Refinery, documents maintained on record at the Yorktown Refinery, and testimony from witnesses and review of documents from the Virginia Department of Environmental Quality ("VDEQ"), which has offices in Richmond and Virginia Beach, Virginia, both of which are located in this District. *See* VDEQ Website, DEQ Regional Offices, http://www.deq.state.va.us/regions/homepage.html. Thus, the convenience of the potential witnesses and the location of the relevant records clearly favor retaining jurisdiction of this matter in the Eastern District of Virginia.

Finally, the interests of justice support this Court retaining jurisdiction over this matter. The Eastern District of Virginia has recognized "the interest in having local controversies decided at home." *U.S. Ship Mgmt., Inc. v. Maersk Line Ltd.*, 357 F. Supp. 2d 924, 936 (E.D.

Va. 2005). This is a local controversy because it involves ongoing environmental remediation at the Yorktown Refinery. The Commonwealth of Virginia and this District both have an important interest in having this action heard in this District because this action involves Defendants' responsibility for the costs of environmental remediation due to a violation of Health, Safety and Environmental Laws during Defendants' ownership and operation of the Yorktown Refinery. Complaint, Doc. No. 1, ¶ 9. Thus, public policy considerations strongly support this Court retaining jurisdiction and denying Defendants' motion to transfer.

For these reasons, this matter is properly venued in the Eastern District of Virginia and Defendants have failed to meet their burden of showing that they are entitled to transfer venue. *Schleit*, 693 F. Supp. at 423; *Gen. Foam*, 806 F. Supp. at 89-90; *Verizon Online Servs.*, 203 F. Supp. 2d at 623-24; *E. Sci. Mktg.*, 696 F. Supp. at 178-80.

## II. Plaintiff's Complaint States a Claim upon which Relief May Be Granted.

Defendants also seek dismissal of this action under Federal Rule of Civil Procedure 12(b)(6) by mistakenly arguing that Plaintiff's Complaint fails to state a claim upon which relief can be granted. Defendants' motion to dismiss essentially is based on two erroneous premises. First, Defendants argue that Plaintiff has no legal right to bring this action. Defendants' Brief, Doc. No. 11, at 21. Second, Defendants argue that Plaintiff's indemnity claim was somehow untimely under the terms of the Agreement. *Id.* at 16. As set forth in detail below, both of Defendants' arguments are without merit and Plaintiff's Complaint clearly states a claim upon which relief may be granted.

### A. Plaintiff Properly Possesses the Right to Enforce the Agreement.

Defendants' argument that Plaintiff has no legal right to bring this action cannot prevail in light of the facts alleged in the Complaint. Defendants in fact admit this by recognizing that

16

the assignment from Giant Industries, Inc. to Giant Yorktown, Inc., its wholly-owned subsidiary, properly conveyed indemnity rights under the Agreement, and that the assignment is sufficiently described in the Complaint. Defendants' Brief, Doc. No. 11, at 21 (quoting Complaint, Doc. No. 1 ¶ 28).

The Assignment provision of the Agreement states that the Buyer, Giant Industries, Inc., may assign its rights and obligations under the Agreement to a wholly owned subsidiary with the necessary performance guaranties. *See* Agreement, Doc. No. 11-3 § 25. Giant Yorktown, Inc. properly received the transfer and assignment of the "right, title and interest" of Giant Industries, Inc. under the Agreement on May 10, 2002. *See* PL Ex. 1, ¶ 4 & Attach. B. This assignment was made with the full knowledge and consent of Defendants and was included in the closing documents for the transaction. *See* PL Ex. 1 ¶ 4 & Attach. B. At that time Giant Industries, Inc. fully guaranteed Giant Yorktown, Inc.'s performance of all of Buyer's obligations under the Agreement. *See* PL Ex. 1 ¶ 4 & Attach. C.

Nevertheless, Defendants seek dismissal, assuming without any basis that there was an additional — and improper — assignment of rights from Giant Yorktown, Inc. to Plaintiff. Defendants' assumption has no basis in fact. *There was no assignment because Giant Yorktown, Inc. and Plaintiff are one and the same legal entity.* The name of Giant Yorktown, Inc. was changed to Western Refining Yorktown, Inc. on September 19, 2007. The name change was recorded in the public records of the State of Delaware, where Plaintiff is incorporated. *See* PL Ex. 2, Attach. A; Complaint, Doc. No. 1, ¶ 10. When Defendants prepared and filed their Motion to Dismiss, the name change records were readily available from the Delaware Secretary of State's website. To properly reflect the name change, Plaintiff stated in the Complaint that it was formerly known as ("f/k/a") Giant Yorktown, Inc. *See* Complaint, Doc. No. 1, caption. The

name change from Giant Yorktown, Inc. to Western Refining Yorktown, Inc. did not alter the

right to enforce the environmental indemnity provisions of the Agreement, which were properly

assigned to Giant Yorktown, Inc. with the full knowledge and consent of Defendants. *See Harris*

*Bank*, 502 N.E.2d at 1129 ("Defendants cannot deny liability because [Plaintiff] changed its

name. There is no reason to prove an assignment . . . because they are one and the same").

Defendants cite to a 10-Q of Western Refining, Inc. (*not* Western Refining *Yorktown*,

Inc.) for the erroneous proposition that Plaintiff Western Refining Yorktown, Inc. f/k/a Giant

Yorktown, Inc. acquired its rights to sue Defendants through operation of the 2007 acquisition of

Giant Industries, Inc. stock by Western Refining, Inc. Defendants' Brief, Doc. No. 11, at 22.

The 10-Q excerpt cited by Defendants merely confirms that Western Refining, Inc. acquired

Giant Industries, Inc. (Giant Yorktown, Inc.'s parent company) through a stock purchase in

2007. It does not alter the fact that the name of Giant Yorktown, Inc. was merely changed to

Western Refining Yorktown, Inc. Because Giant Yorktown, Inc. acquired the rights under the

Agreement in 2002 at the time of the closing in full accordance with the assignment provisions

of the Agreement and with the knowledge and consent of Defendants, Defendants' challenge to

Plaintiff's right to bring this action is unfounded and must be denied. *See Hess Energy, Inc. v.*

*Lightning Oil Co.*, 276 F.3d 646, 650-51 (4th Cir. 2002) (holding that "the fact that Plaintiff

changed its name . . . had no bearing" on contractual rights and obligations).

**B.     The Plain Language of the Agreement Shows that Plaintiff Complied with
the Requirements for Bringing a Claim for Indemnification.**

Plaintiff complied with the requirements for timely asserting a claim for indemnification

under the Agreement, which are contained in Section 15(i) of the Agreement. Section 15(i)

requires that a claim for indemnification "shall be brought within two (2) years after the Closing

Date." Agreement, Doc. No. 11-3 § 15(i) (underlining in original). Section 15(i) also specifies

18

what it means to bring a claim. It expressly states:

> A claim shall be deemed to have been brought *only upon delivery of a proper Indemnification Notice to the other party* at the address set forth in Section 20. Any claim required to be made within such two (2) year period not so timely made shall be forever barred.

Agreement, Doc. No. 11-3 § 15(i) (emphasis added). Thus, under the plain language of the Agreement, a claim must be brought by delivery of an Indemnification Notice.

The capitalized term "Indemnification Notice" is defined in Section 15(e) of the Agreement, which is titled "Procedures Relating to Indemnification Among Buyer and Seller." As stated in the Procedures provision, an Indemnification Notice is:

> written notice to the party from whom indemnification is sought (the "Indemnifying Party"), setting forth the specific facts and circumstances, in reasonable detail, relating to such Loss or Losses and the amount of Loss or Losses (or a reasonable, good-faith estimate thereof if the actual amount is not known or not capable of reasonable calculation) ("Indemnification Notice").

Agreement, Doc. No. 11-3 § 15(e) (underlining in original). Where parties have defined a term in a contract, the court must "enforce the parties' contract in terms of that meaning." *Alexian Bros. Health Providers Assoc., Inc. v. Humana Health Plan, Inc.*, 330 F. Supp. 2d 970, 975 (N.D. Ill. 2004). Defendants' motion fails to address the defined term "Indemnification Notice," no doubt because it is fatal to their erroneous construction of the Agreement.

Plaintiff properly brought its claim for indemnification within two years after the Closing Date, as required by the Agreement. In fact, Defendants attached Plaintiff's November 18, 2003 Indemnification Notice as Exhibit 2 to Defendants' brief. Doc. No. 11-4; PL Ex. 1 ¶ 5 & Attach. D. There can be no dispute that the November 18, 2003 letter is an Indemnification Notice — it is a written notice setting forth the facts and circumstances relating to the amount of anticipated losses in reasonable detail as required by Section 15(e). The November 18, 2003 letter provides an update of the status of the environmental investigation of the Yorktown Refinery, lays out the

additional steps in the USEPA and VDEQ regulatory processes that must occur before

implementation of corrective measures can begin, and provides an estimate of the likely costs for

which indemnification is sought, which at that time totaled approximately $22,800,000. The

November 18, 2003 letter also contains the following demand:

> Giant is entitled to indemnification pursuant to the [Agreement] for costs
> associated with the Consent Order, including any costs it incurs in connection
> with the interim and corrective measures selected by USEPA pursuant to the Final
> Order. Although BP was aware of the Consent Order at the time the Facility was
> sold to Giant, in order to avoid any question regarding compliance with the
> requirements of the [Agreement], this letter serves as notice to BP in accordance
> with Section 15(e) of the [Agreement].

PL Ex. 1, Attach. D at 2. Accordingly, there can be no question that Plaintiff's claim was timely

brought on November 18, 2003 within the meaning of Section 15(i) of the Agreement, because a

proper Indemnification Notice was delivered to Defendants as required by Section 15(e) of the

Agreement. Moreover, because the Agreement specifically provides that a claim is deemed to

have been brought when the Indemnification Notice is delivered, Defendants' argument that

"[t]he Agreement's Notice section and its Claim requirements are separate and distinct,"

Defendants' Brief, Doc. No. 11 at 15, must be rejected. As shown by the plain language of

Section 15(e) and Section 15(i) of the Agreement, the two are actually inexorably linked.

Under the plain language of the "Procedures Relating to Indemnification Among Buyer

and Seller" there is no requirement that Plaintiff incur a specific amount by a specific date in

order to bring a claim for indemnification. Agreement, Doc. No. 11-3 § 15(e). Instead, a claim

can only be brought by the delivery of an Indemnification Notice, *see id.* § 15(i). Section 15(e)

further specifies that the Indemnification Notice may contain either the amount sought or "a

reasonable, good-faith estimate thereof if the actual amount is not known or not capable of

reasonable calculation." *Id.* § 15(e). Defendants' argument that $5,000,000 in costs must be

incurred at the time that the indemnification claim is brought cannot be reconciled with this language, which clearly allows for Plaintiff's indemnification claim to be brought based on a good-faith estimate of future remediation costs. Defendants' attempt to evade the plain meaning of this provision by arguing that a "loss" is somehow different than a "claim," *see* Defendants' Brief, Doc. No. 11 at 15-16, likewise fails because the Agreement expressly defines the term "Loss" to include both "claims" and "losses," Agreement, Doc. No. 11-3 § 15(n), indicating that the parties intended the terms to be used interchangeably and as synonyms.

### C.   Defendants' Interpretation of the Agreement Contravenes the Intent of the Parties as Determined From Reading the Agreement as a Whole.

Defendants wrongly attempt to read the provisions of Section 15(*l*) of the Agreement in tandem with the provisions of Section 15(i) to foreclose any indemnification unless Plaintiff actually spent more than $5,000,000 in cleanup costs within two years after the May 14, 2002 Closing Date. Defendants' Brief, Doc. No. 11, at 14. Defendants' logic is that the use of the undefined term "claim" in Section 15(i), and the use of the same undefined term in Section 15(*l*), links these provisions together to create requirements for asserting a "Claim." The term "Claim" is not actually defined (or even used) anywhere in the Agreement, but appears for the first time on page 14 of Defendants' Brief. Defendants argue that Section 15(i) and Section 15(*l*) of the Agreement must be read together to foreclose any "Claim" for indemnification unless Plaintiff incurs remediation losses of more than $5,000,000 within two years of the Closing Date. Defendants' Brief, Doc. No. 11, at 14.

Defendants' argument is not supported by the plain language of the Agreement. Neither Section 15(e) nor Section 15(i) expressly references Section 15(*l*) as a bar to bringing an indemnity claim. Agreement, Doc. No. 11-3, §§ 15(i) and (*l*). Instead, Section 15(e) states that an indemnity claim may be brought on a "reasonable, good-faith estimate . . . if the actual

amount is not known or not capable of reasonable calculation." *Id.* § 15(e).

Section 15(*l*) is properly understood as a formula for allocating costs between the parties, rather than as a barrier to indemnification. Section 15(*l*) appears in the portion of the Agreement devoted to allocating (and ultimately capping Defendants' responsibility for) the environmental clean up costs for the Yorktown Refinery. Agreement, Doc. No. 11-3, § 15(k). The Agreement sets forth the following limits and mechanisms for allocating such liabilities in Sections 15(k) and (*l*):

> (k)     Limitation of Liability.  Seller's aggregate liability for Indemnification pursuant to this Agreement, including Section 15(b) and (c), shall in no event exceed an amount equal to Thirty-Five Million Dollars ($35,000,000).

> (*l*)     Environmental Remediation Monetary Limitation. Notwithstanding any other provision of this Agreement, none of the Buyer Indemnified Parties shall have any claim under Section 15(b)(iv) of this Agreement against Seller or any other member of the BP Group for any Remediation Losses unless and until the aggregate of all such Remediation Losses incurred or sustained by the Buyer Indemnified Parties exceeds Five Million Dollars ($5,000,000), and then only for the excess over Five Million Dollars ($5,000,000) (the "First Threshold"). After the First Threshold has been reached, Buyer Indemnified Parties shall only have a claim under this Agreement against Seller for fifty percent (50%) of the excess of any Remediation Losses incurred or sustained by the Buyer Indemnified Parties over the First Threshold unless and until the aggregate of all such Remediation Losses incurred or sustained by the Buyer Indemnified Parties exceeds Ten Million Dollars ($10,000,000) (the "Second Threshold"). Thereafter, subject to Sections 15(i) and 15(k), Buyer Indemnified Parties shall have a claim under this Agreement against Seller for 100% of the excess of Remediation Losses over the Second Threshold. . . . .

Agreement, Doc. No. 11-3 §§ 15(k) and 15(*l*) (underlining in original).  Properly construed so that the "words derive their meaning from the context in which they are used . . . [and] viewing each part in light of the others," *Gallagher*, 874 N.E.2d at 58 (internal citation omitted), it is clear that Section 15(*l*) is an allocation formula reflecting the parties' agreement about the appropriate division of cleanup costs, rather than a time-bar to asserting an indemnification claim.  Because Plaintiff has only sought to recover the Remediation Losses that exceed

$5,000,000 according to this allocation formula, *see* Complaint, Doc. No. 1, ¶¶ 41-45, 76, Prayer

for Relief B; Doc. No. 11-4 (Defendants' Exhibit 3), Plaintiff's claim for indemnification is

entirely consistent with the terms of the Agreement.

Defendants' attempt to use the undefined term "claim" in Section 15(*l*) to modify the

procedures for seeking indemnification under Section 15(e) and Section 15(i), and thus foreclose

any recovery by Plaintiff, violates the clear mandate of the Illinois courts that the "intent of the

parties is not to be gathered from detached portions of a contract or from any clause or provision

standing by itself." *Gallagher*, 874 N.E.2d at 58 (internal citation omitted). Construing the

Agreement as a whole, it is clear that the parties intended to resolve the allocation of costs for

remediating the environmental contamination of the Yorktown Refinery in the following way:

- Subject to the indemnity and other provisions of the Agreement, Plaintiff agreed to assume "any and all obligations, responsibilities, liabilities, compliance costs and expenses relating to governmental requirements including mandated cleanup," Agreement, Doc. No. 11-3 § 4(a)(ii)(C), and took over the remediation required by EPA and VDEQ upon purchase of the Yorktown Refinery, Complaint, Doc. No. 1 ¶ 30;

- Defendants agreed to indemnify Plaintiff for "property damage caused by, or any environmental remediation due to a violation of the Health, Safety and Environmental Laws during the pre-Closing operation of the Business by Seller or other members of the BP Group ('Remediation Losses')," Agreement, Doc. No. 11-3 § 15(b)(iv) (underlining in original), but not to "exceed an amount equal to Thirty-Five Million Dollars ($35,000,000)," Agreement, Doc. No. 11-3 § 15(k);

- The parties agreed that the indemnification provisions of the Agreement would be the sole and exclusive remedy for allocating the environmental cleanup costs by waiving "to the fullest extent permitted under applicable law, any and all rights, claims and causes of action they may have against one another relating to the subject matter of this Agreement . . . including such rights, claims and causes of action Buyer may have against Seller under CERCLA, breaches of statutory or implied warranties or otherwise, nuisance or other tort actions, and common law rights of contribution," Agreement, Doc. No. 11-3 § 15(d); and

- The parties agreed to allocate the Remediation Losses so that Plaintiff would be responsible for the first $5,000,000 in cleanup costs, Plaintiff and Defendants would split the second $5,000,000 in cleanup costs, and Defendants would be responsible for all further cleanup costs up to $35,000,000 as reflected in the thresholds, percentages and

amounts specified in Sections 15(k) and (*l*), Agreement, Doc. No. 11-3 §§ 15(k) & (*l*).

This is the natural and reasonable construction of the language of the Agreement when

interpreted as a whole. *See Compton v. Country Mut. Ins. Co.*, 887 N.E.2d 878, 885 (Ill. Ct.

App. 2008).

In contrast, Defendants argue — based solely on their analysis of the undefined term

"claim" appearing in both Section 15(i) and Section 15(*l*) of the Agreement — that the parties

intended to absolve Defendants of any liability for their environmental contamination of the

Yorktown Refinery unless Plaintiff incurred more than $5,000,000 in Remediation Losses within

two years of the Closing Date. Defendants' Brief, Doc. No. 11, at 15-16. Defendants'

interpretation cannot be reconciled with the extensive provisions of the Agreement that provide

for and secure Plaintiff's indemnification rights up to $35,000,000 as a sole and exclusive

remedy. Agreement, Doc. No. 11-3, §§ 4(a)(ii)(C), 15(b)(iv), 15(d), 15(k)-(*l*). In addition,

Defendants' interpretation results in deleting the provision that a "claim shall be deemed to have

been brought . . . upon delivery of a proper Indemnification Notice" and the definition of

"Indemnification Notice" out of the Agreement, "and thus would be an impermissible

construction." *GNB Battery Technologies, Inc. v. Gould, Inc.*, 65 F.3d 615, 622 (7th Cir. 1995);

*see also Smith v. Burkitt*, 795 N.E.2d 385, 389 (Ill. Ct. App. 2003) (prohibiting interpretation of

an agreement "in a way that would nullify any of the provisions . . . or render them

meaningless"). Because the construction of the Agreement urged by Defendants "ignores the

principle that a contract should be construed as a whole and that such construction should be a

natural and reasonable one," *Compton*, 887 N.E.2d at 885, it must be rejected.

**D.** **Defendants' Interpretation of the Agreement Would Create a Perverse**
      **Incentive for Plaintiff to Spend at Least $42,500,000 in Environmental**
      **Remediation Costs within Two Years of Purchasing the Yorktown Refinery.**

Defendants' argument also ignores that the undefined term "claim" appears not once, but three times in Section 15(*l*) of the Agreement. Agreement, Doc. No. 11-3, § 15(*l*). If Defendants' construction is credited by the Court, it leads to a result that could not possibly have been intended by the parties. In addition to the language of Section 15(*l*) concerning the $5,000,000 threshold, on which Defendants rely, Section 15(*l*) also provides that:

> After the First Threshold has been reached, Buyer Indemnified Parties shall only have a *claim* under this Agreement against Seller for fifty percent (50%) of the excess of any Remediation Losses incurred or sustained by the Buyer Indemnified Parties over the First Threshold unless and until the aggregate of all such Remediation Losses incurred or sustained by the Buyer Indemnified Parties exceeds Ten Million Dollars ($10,000,000) (the "<u>Second Threshold</u>").

> Thereafter, subject to <u>Sections 15(i)</u> and <u>15(k)</u>, Buyer Indemnified Parties shall have a *claim* under this Agreement against Seller for 100% of the excess of Remediation Losses over the Second Threshold.

Agreement, Doc. No. 11-3 § 15(*l*) (emphasis added) (underlining in original). If Defendants are correct that a "claim" for indemnity is barred unless it is brought within two years after the Closing Date of the Agreement, then these provisions of Section 15(*l*) foreclose Plaintiff's recovery of *any* environmental cleanup costs for the Yorktown Refinery that are not incurred within two years after the Closing Date. Otherwise both a "claim" for 50% of the Remediation Losses up to $10,000,000, and a "claim" for 100% of Remediation Losses over $10,000,000 would be time-barred by Section 15(i). Thus, under Defendant's erroneous construction of the term "claim," the only way that Plaintiff could get the benefit of the indemnification provisions that the parties agreed to is to spend $42,500,000 on environmental cleanup costs within two years after the closing date,[3] or else (according to Defendants) the time and monetary limitation

---

[3] Using the formula provided in the Agreement, the only way to reach the $35,000,000 limit of Defendants' liability under the indemnity is for Plaintiff to incur $42,500,000 in Remediation Losses because Plaintiff is responsible for paying 100% of the first $5,000,000 in Remediation Losses, Plaintiff and Defendants each pay 50% of the next $5,000,000, then Defendants would

provisions of the Agreement rule out any indemnity "claim."

In interpreting contractual language "it is fundamental that the court adopt a construction of the contract that is reasonable rather than that which would produce an irrational or absurd result." *Village of Creve Coeur*, 543 N.E.2d at 324 (internal citation omitted). "[T]o the extent a contract is susceptible of two interpretations, one of which makes it fair, customary, and such as prudent persons would naturally execute, while the other makes it inequitable, unusual, or such as reasonable persons would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred." *Foxfield Realty, Inc. v. Kubala*, 678 N.E.2d 1060 (Ill. Ct. App. 1997). Because Defendants' proposed interpretation would clearly have "unintended, illogical, absurd, and inequitable results," *id.* at 1065, it must be rejected.

### E. Defendants' Interpretation of the Agreement Ignores and Contravenes the Facts and Circumstances that Provide Essential Context Surrounding the Agreement.

In contrast to the irrational results compelled by Defendants' arguments, Plaintiff's interpretation of the Agreement gives full effect to its plain language, and construes all of the contractual terms in a straightforward and reasonable way. Illinois courts have "recognized that, as part of their duty to evaluate the intent of the parties, the circumstances surrounding the agreement's execution should be considered." *First Bank & Trust Co.*, 787 N.E.2d at 311 (citing 5 M. Kniffin, Corbin on Contracts § 24.7, at 39 (rev. ed.1998)). Indeed, the Supreme Court of Illinois has specifically stated that in interpreting contracts, courts:

> are never shut out from the same light which the parties enjoyed when the contract was executed, and in that view they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them and so as to judge the meaning of the words and the correct application of the language to the things described.

---

pay 100% of the next $32,500,000 if the total Remediation Losses are $42,500,000. Agreement, Doc. No. 11-3, § 15(*l*).

*Haslinger v. Gabel*, 176 N.E. 340, 345 (Ill. 1931).

In this case, the circumstances surrounding the Agreement's execution support and confirm the allegations in Plaintiff's Complaint and Plaintiff's interpretation of the Agreement. As Defendants have admitted, it was generally known for more than a decade before the Agreement was reached that there was environmental contamination at the Yorktown Refinery. Defendant's Brief, Doc. No. 11, at 2. Environmental remediation was necessary due to a violation of Health, Safety and Environmental Laws during Defendants' 46 years of operation of the Yorktown Refinery. Complaint, Doc. No. 1, ¶ 19. Starting in 1991, Defendants were required by USEPA and VDEQ to undertake investigative and cleanup activities at the Yorktown Refinery to address the contamination. *Id.* ¶¶ 20-25. Defendants' efforts included the submission of at least seven reports to USEPA from January 1992 through November 30, 2000. *Id.* ¶ 24.

When Plaintiff agreed to assume Defendants' environmental liabilities in the Agreement, the parties understood that the remedial process at the Yorktown Refinery would be lengthy. The environmental investigation had already been underway for more than a decade, and required the submission of numerous reports to state and federal regulators. *Id.* ¶¶ 20-25. Both parties were well aware of the extensive reports and applications for government approval that were necessary before remedial plans could be finalized, PL Ex. 1 ¶ 6, and the selection of the final remedial action by the regulatory authorities was still years away. Complaint, Doc. No. 1 ¶ 32. Moreover, the timing of approvals from these regulatory authorities was not under Plaintiff's control. PL Ex. 1 ¶ 6. As such "[i]t is entirely inconsistent with the status of the corrective action process known to BP and Giant at the time of the closing, and the intent and structure of the indemnification provisions of the Agreement, to read a requirement into the

Agreement for incurrence of $5,000,000 in remediation costs within two years of the Closing date." *Id.* ¶ 6.

In light of these facts and circumstances, Section 15(*l*) of the Agreement cannot be understood to preclude any indemnity unless Plaintiff incurred $5,000,000 in remediation costs within two years of the Closing Date. That was clearly not Plaintiff's intent in agreeing to assume responsibility for the cleanup and waive all other claims against Defendants in exchange for the indemnification provisions of the Agreement. PL Ex. 1 ¶ 6. Rather, Plaintiff understood the indemnity provisions of the Agreement as "cost-sharing mechanisms . . . to cover the environmental remediation at the Yorktown Refinery." *Id.* ¶ 2. In fact, between the time that the Agreement was signed and the Closing Date of the transaction, Plaintiff drafted financial disclosure language for the purpose of raising capital and submitted it to Defendants for review, prior to disclosing it to the SEC and the public. *Id.* ¶ 3. The description of the indemnity provisions of the Agreement was that Plaintiff would be responsible for the first $5,000,000 in remediation costs, Plaintiff and Defendants would split the second $5,000,000 (costs between $5,000,000 and $10,000,000) and Defendants would be responsible for anything over $10,000,000 up to a $35,000,000 cap on their total indemnity payments. *Id.* ¶ 3. Defendants never objected to this description of the Agreement's indemnity provisions in Plaintiff's financial disclosures. *Id.* ¶¶ 3, 7. Because it is the most straightforward interpretation of the Agreement's language, and it is the interpretation that best reflects the facts and circumstances known to the parties at the time of the Agreement's execution, the Court should interpret the Agreement to allow for recovery of the costs Plaintiff has incurred in addressing Defendants' environmental contamination according to the formula provided in Section 15(*l*) of the Agreement, rather than to foreclose Plaintiff's claims.

**F.    Even If Plaintiff Did Not Bring Its Claim for Indemnification Within Two Years, This Case Cannot Be Dismissed Because Defendants Have Not Been Prejudiced.**

Finally, even if Defendants' arguments about the requirements for asserting an indemnity "claim" are fully credited, Defendants are not entitled to dismissal of this matter. At its core, Defendants' argument is that Plaintiff's indemnity claim is time-barred because Plaintiff failed to incur $5,000,000 in losses and bring its claim for indemnification within two years of the Closing Date. Defendants' Brief, Doc. No. 11, at 17. However, Section 15(e), which contains the Procedures for bringing an indemnity claim under the Agreement, expressly provides that "failure to give such Indemnification Notice on a timely basis shall not affect the indemnification provided hereunder except to the extent the Indemnifying Party shall have been *actually and materially prejudiced* as a result of such failure." Agreement, Doc. No. 11-3 § 15(e) (emphasis added). Even if Plaintiff's Indemnification Notice was not properly delivered until May 29, 2007, when Plaintiff had incurred more than $5,000,000 in environmental cleanup costs, *see* Doc. No. 11-4 (Defendants' Exhibit 3), Defendants cannot establish that they were "actually and materially prejudiced" as a result of the delay.

Defendants were clearly on notice of the environmental contamination of the Yorktown Refinery — they are the ones that caused it. Complaint, Doc. No. 1 ¶¶ 19-20. Indeed, Defendants had been conducting the environmental cleanup of the Yorktown Refinery as required by USEPA and VDEQ for more than a decade, and thus had actual knowledge of the existence of the contamination and the regulatory requirements for cleaning it up. *Id.* ¶¶ 19-25. Within two years after the Closing Date, Defendants also received actual notice that the costs of the environmental cleanup of the Yorktown Refinery would exceed $5,000,000, because Plaintiff's November 18, 2003 letter estimated that the costs would be at least $22,800,000. PL

Ex. 1, Attach. D.  Any alleged delay in the assertion of an indemnification claim benefited, rather than prejudiced, Defendants because it prolonged the period of time until they would be asked to pay for their agreed-upon share of the environmental remediation costs.  Accordingly, Plaintiff's Complaint clearly states a claim for which relief can be granted.

## CONCLUSION

Defendants' Rule 12(b)(3) Motion to Dismiss or Transfer Venue and Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim should be denied.  Venue is proper in this Division of this District under the plain language of the Agreement.  Moreover, Defendants have failed to meet their heavy burden of showing that Plaintiff's choice of forum should be disturbed. Defendants have likewise failed to establish that Plaintiff is not a proper party to bring this action.  Finally, Defendants' motion to dismiss must be denied because Plaintiff has complied with the requirements of the Agreement for bringing a claim for indemnification.  Moreover, Defendants have not shown that they have been prejudiced in any way by not being subjected to judicial action before now.  For the foregoing reasons, Defendants' motions must be denied.

Dated: January 7, 2009                              Respectfully submitted,


                                            /s/_____
                                            Gary A. Bryant
                                            VA Bar No. 27558
                                            Counsel for Western Refining Yorktown, Inc.
                                            f/k/a Giant Yorktown, Inc.
                                            WILLCOX & SAVAGE, P.C.
                                            1800 Bank of America Center
                                            Norfolk, Virginia 23510
                                            Telephone: (757) 628-5500
                                            Facsimile:  (757) 628-5566
                                            gbryant@wilsav.com

                                            Michael D. Goodstein
                                            D.C. Bar No. 469156
                                            Anne E. Lynch

VA Bar No. 73430
Counsel for Western Refining Yorktown, Inc.
f/k/a Giant Yorktown, Inc.
RESOLUTION LAW GROUP, P.C.
5335 Wisconsin Avenue, N.W., Ste. 360
Washington, D.C. 20015
Telephone: (202) 895-5380
Facsimile: (202) 895-5390
mgoodstein@reslawgrp.com
alynch@reslawgrp.com

Philip C. Hunsucker
CA Bar No. 135860
Counsel for Western Refining Yorktown, Inc.
f/k/a Giant Yorktown, Inc.
RESOLUTION LAW GROUP, P.C.
3717 Mt. Diablo Boulevard, Ste. 200
Lafayette, CA 94549
Telephone: (925) 284-0840
Facsimile: (925) 284-0870
phunsucker@reslawgrp.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Douglas Haber Green
Lowell Mark Rothschild
Damon William Wright
Counsel for BP Corporation North America, Inc.
and BP Products North America, Inc.
VENABLE LLP
575 7th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 344-4483
Facsimile: (202) 344-8300
dhgreen@venable.com
lrothschild@venable.com
dwdwright@venable.com

To the best of my knowledge, there are no other attorneys who require service by U.S. Mail.

/s/ _____

Gary A. Bryant
VA Bar No. 27558
Counsel for Western Refining Yorktown, Inc.
f/k/a Giant Yorktown, Inc.
WILLCOX & SAVAGE, P.C.
1800 Bank of America Center
Norfolk, Virginia 23510
Telephone: (757) 628-5500
Facsimile:  (757) 628-5566
gbryant@wilsav.com

Michael D. Goodstein
D.C. Bar No. 469156
Anne E. Lynch
VA Bar No. 73430
Counsel for Western Refining Yorktown, Inc.
f/k/a Giant Yorktown, Inc.
RESOLUTION LAW GROUP, P.C.
5335 Wisconsin Avenue, N.W., Ste. 360
Washington, D.C.  20015
Telephone: (202) 895-5380
Facsimile:  (202) 895-5390
mgoodstein@reslawgrp.com
alynch@reslawgrp.com

Philip C. Hunsucker
CA Bar No. 135860
Counsel for Western Refining Yorktown, Inc.
f/k/a Giant Yorktown, Inc.
RESOLUTION LAW GROUP, P.C.
3717 Mt. Diablo Boulevard, Ste. 200
Lafayette, CA  94549
Telephone: (925) 284-0840
Facsimile:  (925) 284-0870
phunsucker@reslawgrp.com

I-855371.2